THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GILBERT P. HYATT,<br><br>　　　　　Plaintiff,<br>　v.<br><br>UNITED STATES PATENT AND<br>TRADEMARK OFFICE,<br><br>　　　　　Defendant. | Case No. 1:18-cv-02800-TSC |

**PLAINTIFF'S COMBINED REPLY IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

The dispute in this case boils down to the question of whether the PTO should be allowed to treat Mr. Hyatt as a commercial user and charge him hundreds of thousands of dollars for the privilege of obtaining the records necessary for him to educate the public about the operations of Art Unit 2615, also known as the Hyatt Unit. The PTO has already found that there is "'considerable public interest' implicated by" Mr. Hyatt's patent applications, *see* ECF No. 1, Complaint, Ex. H, at 748[1], and the Court agrees, as it recently found that "there is a cognizable public interest associated with the release" of documents that "contribute to the public's understanding" about the Hyatt Unit. *Hyatt v. PTO*, 346 F. Supp. 3d 141, 151–52 (D.D.C. 2018). Contrary to the PTO's claims, there is no meaningful argument that Mr. Hyatt, an individual that the PTO argues "has amassed a fortune" from his inventions, Opp. at 23, would be unable to follow through with his intention to educate the public about the Office's activities. Following on the heels of the parties' most recent FOIA dispute, where the PTO forced Mr. Hyatt to wait nearly a year and to litigate to judgment its attempt to obtain a single email that provided "a plausible basis for Mr. Hyatt to suspect" that PTO officials'

---

[1] All of the citations to Compl. Ex_ in this Reply and Opposition are to the exhibits attached to the Complaint filed in this action on the public docket, *see* ECF No. 1.

personal opinions "may have interfered with their work," *Hyatt*, 346 F. Supp. 3d at 152, the PTO's Opposition confirms that it is doing to Mr. Hyatt what it has done to him for decades—delay, discourage, and deny his attempts to exercise his rights. This Court has previously described the PTO's "chutzpah" in "chaf[ing] against" Mr. Hyatt's attempt to "vindicate [his] rights through lawfully available means" as "somewhere between vexing and outright galling." *Hyatt v. Iancu*, 332 F. Supp. 3d 113, 133 n.14 (D.D.C. 2018). The Court should put an end to the PTO's latest recalcitrant act by granting Mr. Hyatt's motion for summary judgment, denying the PTO's cross-motion, granting Mr. Hyatt a fee waiver in conjunction with his modified request that requires the PTO to provide him with the requested documents at no cost, and determining that he is not a commercial-use requester.

**A.     Mr. Hyatt Is Entitled To A Fee Waiver For The Modified FOIA Request**

There are only three requirements that a requester must meet to be entitled to a fee waiver: "Disclosure of the requested information must: (a) shed light on 'the operations or activities of the government'; (b) be 'likely to contribute significantly to public understanding' of those operations or activities; and (3) not be 'primarily in the commercial interest of the requester.'" *Cause of Action v. FTC*, 799 F.3d 1108, 1115 (D.C. Cir. 2015) (quoting 5 U.S.C. § 552(a)(4)(A)(iii)). Mr. Hyatt meets each of these requirements.[2]

**1.     The Requested Information Will Shed Light On The Operations Or Activities Of The Government**

As explained in Mr. Hyatt's summary judgment motion, his request seeks documents sent by the two heads of the Hyatt Unit concerning his patent applications or himself. These documents shed light on the Hyatt Unit's operations or activities, in the same manner that this Court found that the disclosure of an email between two examiners in that Unit

---

[2] The PTO structures its opposition along the four factors set forth in its regulations for fee waivers and claims that Mr. Hyatt must meet each factor to qualify. Opp. at 7 (citing 37 C.F.R. § 102.11(k)(2)). But the court does not defer to this interpretation and instead takes the statute on its own terms. *See Cause of Action*, 799 F.3d at 1115 ("[C]ourts owe no particular deference to an agency's interpretation of FOIA") (citation and quotation marks omitted).

commenting negatively on Mr. Hyatt's character sheds light on the operations of the Hyatt Unit. Hyatt MSJ at 14–15.

The PTO does not dispute that the request seeks information on the Hyatt Unit and that the Hyatt Unit's operations are activities of the PTO. Opp. at 8. Paradoxically, the PTO does dispute that the requested documents concerning the Hyatt Unit's leaders' activities regarding Mr. Hyatt and his patent applications would contribute to an understanding of those operations or activities. Opp. at 8. The PTO's opposition is meritless.

Initially, and contrary to the PTO's suggestion, Opp. at 8–9, Mr. Hyatt's request seeks documents that would shed light on the operation of the Hyatt Unit, and not solely on the basis of the PTO's misconduct. The Hyatt Unit employed 20 percent of the GS-15 examiners in the entire PTO at the time the Hyatt Unit was established; since October 2012, the PTO expended "about $10 million" on Mr. Hyatt's applications on just the examiners' salaries. Compl. Ex. H, at 171. The subject of the request are certain documents from the two heads of the Hyatt Unit, Diego Gutierrez and Greg Morse, and the PTO acknowledges that the request seeks "email and work product history for" these individuals concerning their supervision of this division within the PTO—not ancillary or irrelevant documents. It is not possible for Mr. Hyatt, having not seen these non-public documents, to derive more detailed criteria for understanding the Hyatt Unit's operations than seeking documents concerning him and his applications from the leaders of the Hyatt Unit, and the PTO suggests no more narrowly tailored approach in its litigation papers than Mr. Hyatt has requested.

In this regard, Mr. Hyatt's requests for certain documents concerning him or his patent applications from two key PTO officials is no broader than the request that the D.C. Circuit found was eligible for a fee waiver in *Rossotti*, which sought, among other things, documents regarding "decisions by the IRS involving" a specified private company and the Commissioner's relationship with that company. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1313 (D.C. Cir. 2003) (finding that the court "cannot imagine" what else the requester could do to satisfy reasonable specificity requirements). And it is far narrower than cases

where waivers were denied like *Judicial Watch, Inc. v. U.S. Department of Justice*, which sought information from any custodians related in any way to decisions from multiple officials and government agencies, some named and some not named, concerning the government decision to release Elian Gonzalez. 133 F. Supp. 2d 52, 53–54 (D.D.C. 2000). The fact that the PTO may have many responsive records does not make Mr. Hyatt's request insufficiently specific—it only means that the PTO has substantial operations or activities in this area, and that is all the more reason for disclosure.

While the PTO's litigation counsel may claim it is "absurd to suggest that the public would be meaningfully informed" by these documents, apparently due to their quantity, Opp. at 10, Mr. Hyatt has the intent and ability to synthesize this information to better communicate its meaning to the public, Compl. Ex F, at 10–11, and the Court has already found that emails from the Hyatt Unit do shed light on government operations, namely, "the examination of Mr. Hyatt's applications," *Hyatt*, 346 F. Supp. 3d at 149. The PTO contends that Mr. Hyatt's reliance on this decision exhibits "temerity," but it is the PTO's attempt to run from this decision that lacks merit. In that case, which Mr. Hyatt called the "Khuu FOIA" case in his summary judgment motion, the PTO withheld an email authored by Cindy Khuu (one of the patent examiners who at the time was examining Mr. Hyatt's applications) that commented negatively on Mr. Hyatt's character. This email was authored in response to yet another email from a fellow Hyatt Unit examiner forwarding decades-old news articles on Mr. Hyatt's divorce proceedings. The PTO claimed this email was not an agency record and was exempt from disclosure under FOIA exemption 6 as personal to Ms. Khuu.

After reviewing the email *in camera* over the PTO's objection, the Court ruled in Mr. Hyatt's favor on both grounds. In finding that the PTO's Exemption 6 defense failed "miserably," 346 F. Supp. 3d at 147, the Court weighed Ms. Khuu's interest in the document against "the public's right to government information," a balancing that considered the same issue that is present in this case—"whether releasing the document would shed light on an agency's performance of its statutory duties," *id.* at 151 (citation and quotation marks

4

omitted). The Court found that the Khuu email—which did not address examination issues but instead commented negatively on Mr. Hyatt's character—"does contribute to the public's understanding about a specific unit within the PTO" and, even more broadly, "is a document that could be argued to shed light on an entire Art Unit's approach to its work." *Id.* at 152. The PTO has no argument why the Khuu email would shed light on the PTO's operations while the records sought in this case, which focus on the Hyatt Unit leaders' treatment of Mr. Hyatt and his applications, would not shed light on the Hyatt Unit's operations.

The Khuu FOIA case also shows that the public would be unlikely to gain the same understanding of the PTO's operations from a more granular request because the PTO has proven itself unwilling to perform any meaningful gatekeeping function, at least where Mr. Hyatt is concerned. In the Khuu FOIA case, this Court found in a published decision that the sworn statement made by the same FOIA officer who authored many documents in the record and a litigation declaration in this case, was "downright misleading." *Id.* at 152. The Court only discovered the "downright misleading" content of the declaration when it conducted an *in camera* review of the Khuu email. For its part, the PTO opposed *in camera* review on grounds that the Court should instead just rely on the same sworn statement that the Court later found to be "downright misleading" when it actually reviewed the document. *Id.* Under these circumstances, it was entirely reasonable for Mr. Hyatt to request documents without more granular subject limitations that could open the door to mischief from an agency that has proven itself to be "downright misleading" to the court in attempting to avoid public disclosure of its treatment of Mr. Hyatt and his patent applications.

In addition to shedding light on the operations of the Hyatt Unit generally, the requested documents are likely to evidence government misconduct. The public has a strong interest in knowing the extent of the PTO's practices in targeting certain applications for not receiving patents, despite those applications being otherwise deserving of a patent. It is of paramount importance that the public has confidence in the PTO's integrity in examining patent applications because "a democracy is effective only if the people have faith in those

5

who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 562 (1961). In fact, this interest applies no matter what the requested documents ultimately show. *See Rossotti*, 326 F.3d at 1314 ("[T]he question here is not whether [the IRS Commissioner] had such a conflict, but whether disclosure of the requested documents is likely to contribute to public understanding of IRS operations—a goal that disclosure will promote regardless of what the documents reveal."). The PTO has nothing meaningful to say about Mr. Hyatt's substantial evidentiary showing that the PTO has been blocking issuance of patents to him for decades through, among other things, revoking issued patents that he had paid the issue fees for, Compl. Ex. H, at 230–31, causing more than 1,000 years of aggregate delay through suspending examination of his applications in a way that violated its operating procedures, Compl. Ex. F, at 21–22, disparaging Mr. Hyatt in emails, Compl. Ex. F, at 7, 142, subjecting Mr. Hyatt's applications to a secret Sensitive Application Warning System ("SAWS") program that prevented them from issuing, Compl. Ex. F, at 8–9, and admitting to "recycling" his applications to never-ending cycles of further examination after Mr. Hyatt beat the agency in his administrative appeals, Compl. Ex. F, at 26.

The PTO's blithe dismissal of its actions as "fail[ing]" to identify any misconduct, Opp. at 9, stands in stark contrast to the Eastern District of Virginia's finding that Mr. Hyatt has plausibly alleged that the PTO has adopted and is presently implementing a policy of blocking his applications from issuing based on a complaint that includes these allegations. ECF No. 66, *Hyatt v. U.S. Patent and Trademark Office*, No. 1:18-cv-00546 (E.D.V.A. Mar. 26, 2019). As the Eastern District of Virginia put it, "there are legal rights here and we need to ensure that the agency fulfills its obligations." Ex. A, at 3 (Tr. 22:13–15). And "nobody can look at this situation, which has started in the 1990s and continues today and not say: Something is not right here." Ex. A, at 8 (Tr. 27:21–23).

In contrast to Mr. Hyatt's substantial evidentiary showing of potential government misconduct, the bulk of the PTO's authorities opposing Mr. Hyatt's fee waiver were not supported by a significant administrative record. In *American Federation of Government Employees v. Department of Commerce*, 632 F. Supp. 1272, 1274 n.2 (D.D.C. 1986), the only evidence of misconduct was "various complaints" filed by Union members in grievance proceedings. *Klein v. Toupin*, 2006 WL 1442611, at *4 (D.D.C. 2006), concerned only "[b]are allegations of malfeasance, unsupported by the evidence" where the plaintiff failed to support his claims with "any evidence whatsoever." Likewise, *Ferrigno v. U.S. Department of Homeland Security*, 2011 WL 1345168, at *6 (S.D.N.Y. Mar. 29, 2011), concerned "purely conclusory" allegations that the requested documents "may involve planning or unlawful or inappropriate actions by high ranking officials," rather than supported allegations like Mr. Hyatt has made. *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice ("CREW")*, 602 F. Supp. 2d 121, 129 (D.D.C. 2009), quoted *Klein*'s "bare allegations of malfeasance" language but reversed the agency's determination not to grant a fee waiver because the requester "supported its specific request for information by reference to news reports casting doubt on the propriety of the" contested policy, much as Mr. Hyatt supported his claims of government malfeasance in the examination of his applications with significant evidentiary material. And there is no indication that the requester in *Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp. 2d 52 (D.D.C. 2000), even alleged government misconduct.[3]

---

[3] The PTO cites *D.C. Technical Assistance Org. v. HUD*, 85 F. Supp. 2d 46 (D.D.C. 2000) ("*DCTAO*"), in support of its argument that the requested documents would not shed light on government operations or activities, but the court actually found to the contrary on this factor. *Id.* at 48–49. The court ultimately denied the fee waiver on grounds that it would not contribute significantly to the public's understanding of government activities or operations, *see id.* at 49, but the *DCTAO* requester's showing of intent to disseminate and other parties' interest in the material falls far short of the showing Mr. Hyatt made in this case. Likewise, the *DCTAO* requester made only allegations but did not make "a colorable showing of…bad faith," unlike Mr. Hyatt's substantial evidence of PTO misconduct.

Finally, the PTO argues (at 10) that if the Court grants Mr. Hyatt a fee waiver, "there is no doubt he would" expand his request and seek a fee waiver for the additional information. But what Mr. Hyatt could attempt to do so in the future is speculative and irrelevant to the assessment of his entitlement to a fee waiver for the modified request that is actually under consideration here.[4] In addition, the PTO's suggestion that Mr. Hyatt should somehow be denied a fee waiver because he might seek additional documents in the future partakes of the PTO's "chutzpah" in "chaf[ing] against" Mr. Hyatt's attempt to "vindicate [his] rights through lawfully available means," which this Court has previously found to be "somewhere between vexing and outright galling." *Hyatt*, 332 F. Supp. 3d at 133 n.14. Under this logic, the government could deny a fee waiver to a media organization or government reform group because that might lead to more FOIA requests with fee waivers, an argument no court would accept. Either Mr. Hyatt is entitled to the waiver or he is not. The PTO's attempt to argue that Mr. Hyatt should be treated less favorably because he may attempt to exercise his legal rights in the future just reinforces his concerns about the Office's treatment of him.

### 2. The Requested Information Will Contribute Significantly To The Public Understanding Of The Hyatt Unit's Activities

As explained in Mr. Hyatt's summary judgment motion, Mr. Hyatt's request is likely to contribute significantly to the public understanding of the Hyatt Unit's activities, as there is substantial public interest in Mr. Hyatt's applications and Mr. Hyatt has made detailed plans to disseminate those documents to the interested public. Hyatt MSJ at 15-16. Among other things, Mr. Hyatt offered an affidavit explaining that he would provide the information to the American Center for Equitable Treatment ("ACET"), a non-profit corporation that disseminates information gathered through FOIA requests and other public records sources, as well as analyses of such information, on its website at www.acet-usa.org. Mr. Hyatt further stated that he would publish the records at www.ptomisconduct.com, a website that also

---

[4] If the PTO truly has "no doubt" that Mr. Hyatt would seek further records based on the requested disclosures, it is rather indicative of its advance knowledge of the misconduct that would be exposed by this disclosure.

includes information and analyses related to the PTO's misconduct towards Mr. Hyatt and other patent applicants. Mr. Hyatt explained his capabilities in analyzing and disseminating this type of information, as well as his intention to do so. And Mr. Hyatt explained that there is a reasonably broad audience interested in this information, with articles about him and his disputes with the PTO regularly appearing in publications ranging from the USA Today to widely read patent blogs. *See* Compl. Ex H, at 6–7. This explanation more than meets the "detailed and non-conclusory" standard for planned dissemination from *Rossotti*. 326 F.3d at 1314 (holding that FOIA requires only a "detailed and non-conclusory" explanation of the requester's plan to disseminate requested materials).

The PTO's primary rejoinder is that Mr. Hyatt failed to demonstrate that he would reach a reasonably broad audience of persons interested in the subject, often by picking piecemeal at the record without considering it as a whole. Here too, the PTO's effort fails. For example, the PTO wrongly claims that FOIA requires a showing of the numerical levels of reach of disseminated information on the internet. But the reasoning of *Cause of Action* is incompatible with such a rigid requirement, noting "[t]here is nothing in the statute that specifies the number of outlets a requester must have," 799 F.3d at 116, and there likewise is no specific number of page views a website may have so long as the requester does what Mr. Hyatt has done, which is make a firm commitment to disseminate the disclosed records to a reasonably broad audience of interested persons in a reasonably specific manner, *see Rossotti*, 326 F.3d at 1312.

In another example, the PTO cites *Donato v. Executive Office for United States Attorneys*, 308 F. Supp. 3d 294 (D.D.C. 2018), for the proposition that Mr. Hyatt is not entitled to a fee waiver because he "'has not provided any details about the *reach* of' the website to which he intended to release the requested information," Opp. at 15–16 (emphasis in original) (quoting 308 F. Supp. 3d at 312), but *Donato* concerned a federal prisoner who sought records related to an alleged plot to frame both another inmate and a prison employee for conspiracy to commit murder. In that case, the requester stated that he would send the information to

9

newspapers that had not expressed interest in publishing these type of records (unlike Mr. Hyatt, whose conflicts with the PTO have been widely reported) and post information on a website that "either does not exist or is not actually publicly available," *Donato*, 308 F. Supp. 3d at 311–12. In contrast, Mr. Hyatt is a member of ACET, making it reasonably certain that ACET will publish the information, and Mr. Hyatt maintains a dedicated website for publishing this type of information that is not defunct and contains other evidence of PTO misconduct towards him and other applicants. In fact, *Donato* specifically contrasts the requester there from a case like Mr. Hyatt's where the requester "operates his own means of information dissemination such as a newsletter or a website." *Id.* at 311 (citation omitted).

Similarly, in *National Security Counselors v. Department of Justice*, 848 F.3d 467, 474 (D.C. Cir. 2017), the requester maintained a website that was only a clearinghouse for the records and failed to include any relevant analysis of those materials, save one publication. Both the ACET and www.ptomisconduct.com websites are far more fulsome than the National Security Counselors website, each containing multiple articles regarding Mr. Hyatt, SAWS, and other subjects. And while the *National Security Counselors* decision did note that the requester did not provide information about website traffic or audience size, that factor was relevant to the question of a "discernable audience for the disclosures." *Id.* In contrast, Mr. Hyatt provided ample information about the audience for the requested information, including making a substantial evidentiary record on the public interest in Mr. Hyatt and his applications, and the audience for publication on the ACET and www.ptomisconduct.com websites. Compl. Ex F, at 9–11. Mr. Hyatt also explained that the PTO has admitted that his applications were subject to SAWS, the PTO's secret program for blocking disfavored patent applications, which is likewise the source of substantial public interest. Compl. Ex F, at 8–9.

In this regard, the PTO complains that Mr. Hyatt "cites to no case that has held that general public interest in a subject is a consideration when assessing whether the requester has the ability to disseminate the requested records to a reasonably broad audience." Opp. at 17. But this information goes directly to "the extent of the 'public' the information is likely to

10

reach," which is one of the factors that the *Cause of Action* court held to be relevant to determining whether the requested records likely will contribute significantly to the public understanding of the PTO's operations. 799 F.3d at 1116.

In summary, the PTO's claim that Mr. Hyatt has not provided sufficient information concerning his ability to synthesize and disseminate the requested records to a reasonably broad audience of interested persons cannot be squared with either Mr. Hyatt's concrete plans to do so or the PTO's complaints about the "fortune" Mr. Hyatt has amassed from his inventions. Opp. at 23. Instead, it is "just the sort of roadblock and technicality that led Congress to liberalize the fee waiver provision." *Rossotti*, 326 F.3d at 1315 (citations and quotations omitted).

### 3. The Requested Information Is Not Primarily In Mr. Hyatt's Commercial Interest

Mr. Hyatt's interest in the documents is not primarily commercial. As this Court explained in the Khuu FOIA case, while "Mr. Hyatt's FOIA request is undoubtedly not wholly separate from his litigation interests, the PTO's argument ignores that how its patent examiners approach their jobs is a question that falls squarely within the public's right to know how their government is functioning." 346 F. Supp. 3d at 152. The public's right-to-know how the PTO is conducting its activities examining Mr. Hyatt's applications—and Mr. Hyatt's right to know—applies equally to the subjects of the instant request, who were the supervisors of the patent examiners at issue in the Khuu FOIA case and whose performance of their job functions is equally a matter of public interest.

The PTO's attempts to argue that Mr. Hyatt's interests are primarily commercial fail. First, the PTO argues (at 23) that "[t]he request at issue in this case appears to be aimed at forcing Defendant to issue more patents to Plaintiff, which presumably would enhance his income." That statement is false. The records at issue in this case are aimed at determining how Messrs. Morse and Gutierrez, the heads of the Hyatt Unit, performed their duties regarding Mr. Hyatt and his patent applications. But the only way that the PTO can issue

more patents to Mr. Hyatt is for the Office to examine his patent applications and determine that they meet the criteria for patentability in the Patent Act. The file histories of those applications are excluded from the request as are all other types of documents that could be in those histories. Instead, what the requested documents would most readily show is how the PTO performed, or failed to perform, its statutory obligations in examination. And as this Court found in the Khuu FOIA case, the public—including Mr. Hyatt—has the right to understand how the PTO's patent examiners approach their jobs. *See* 346 F. Supp. 3d at 152.

In fact, it is remarkable that that the PTO considers a mark against a fee waiver the possibility that the requested documents evidence misconduct against Mr. Hyatt: "It stands to reason that, should the requested documents contain evidence of misconduct by USPTO employees who handled Mr. Hyatt's patent applications, that information would be relevant to Mr. Hyatt's legal strategy against the Agency." Opp. at 24 (citing Compl. Ex J, at 9). But uncovering government misconduct is not some type of beneficial accounting adjustment for the victim of that misconduct. Here, as the PTO did in the Khuu FOIA case when it argued that evidence of bias was not an agency record because PTO employees are not allowed to be biased, the PTO is advancing an argument that would "hinder a FOIA requester's ability to uncover fraud, waste, or abuse in government agencies," impairing "the universally recognized purpose of FOIA," which "is to make government more transparent." 346 F. Supp. 3d at 149–50.

The PTO's arguments about Mr. Hyatt's litigation against it are likewise meritless. While the PTO lists several current or former lawsuits between Mr. Hyatt and the federal government, Opp. 21 n.4, it does not contest Mr. Hyatt's explanation that he could not use the requested records in most of them. The only action the requested documents could potentially be used in is *Hyatt v. PTO*, No. 1:18-cv-00546-TSE-MSN (E.D. Va.), an action whose filing postdates the initial FOIA request here by many months. In that case, the district court found that Mr. Hyatt plausibly alleged that the PTO had adopted and was implementing an "alleged *de facto* policy or rule not to issue [Mr. Hyatt] any more patents." ECF No. 66, at

12

4, *Hyatt v. U.S. Patent and Trademark Office*, No. 1:18-cv-00546-TSE-MSN (E.D.V.A. Mar. 26, 2019). That lawsuit does not seek to force the PTO to issue Mr. Hyatt patents based on patent applications that the PTO has not already determined meet the statutory criteria for patentability, but instead seeks an equitable remedy tailored towards remedying the PTO's policy of blocking Mr. Hyatt's patent applications.[5] And because the subject matter of that lawsuit challenges the PTO's misconduct towards his applications, it was entirely appropriate for Mr. Hyatt to alert the Court about the PTO's disclosure of agency records disparaging him while the Court was considering this issue on a motion to dismiss. *See* ECF No. 65, Hyatt v. PTO, No. 1:18-cv-00546-TSE-MSN (E.D.V.A.); Ex B.

Finally, even if the court concludes that Mr. Hyatt has an attenuated commercial interest because he would ultimately like to see his patent applications issue and this FOIA request could be useful in removing the PTO's unlawful policy blocking those patents from issuing regardless of their merits, that interest does not predominate. Instead, the primary interests in this request are Mr. Hyatt's interest in publicly exposing the PTO's misconduct towards him and the public's interest in ending government misconduct like the PTO's actions towards Mr. Hyatt.

In summary, the Court should reject the PTO's self-serving attempt to shield its misconduct from public scrutiny through abuse of the FOIA process. It should determine that Mr. Hyatt is entitled to a fee waiver.

**B.     Mr. Hyatt Does Not Intend to Put the Records to Commercial Use**

In addition to being entitled to a fee waiver, the Court should determine that the modified FOIA request is not a commercial use request because Mr. Hyatt intends to use the material to educate the public, not to further his commercial, trade, or profit interests.

As a preliminary matter, the PTO's argument that the PTO's commercial-use

---

[5] One count in the Eastern District of Virginia did ask that court to direct the PTO to issue a patent on an application that Mr. Hyatt contends the PTO had already found to include allowable material, but that claim was dismissed.

determination is reviewed under the arbitrary and capricious standard of Administrative Procedure Act § 706 is incorrect. FOIA provides that "[i]n any action by a requested regarding the waiver of fees under this section, the court shall determine the matter de novo." 5 U.S.C. § 552(a)(4)(A)(vii). The PTO contends that only a determination to "furnish[] without any charge or at a charge reduced below the fees" made under 5 U.S.C. § 552(a)(4)(A)(iii), and not a decision classifying Mr. Hyatt as a "commercial use[r]" under § 552(a)(4)(A)(ii), is governed by the de novo review provision of 5 U.S.C. § 552(a)(4)(A)(vii). The PTO's argument misreads the plain language of the FOIA statute and ignores substantial authority contrary to its position.

As a matter of plain language, the best reading of FOIA is that categorization determinations under 5 U.S.C. § 552(a)(4)(A)(ii) are governed by the de novo review provision of 5 U.S.C. § 552(a)(4)(A)(vii). FOIA does not define what constitutes a "waiver of fees under this section" within the meaning of 5 U.S.C. § 552(a)(4)(A)(vii)'s de novo review provision, and this statutory term is not used in either 5 U.S.C. § 552(a)(4)(A)(ii), governing categorization determinations, or 5 U.S.C. § 552(a)(4)(A)(iii), covering fee reduction determinations. Congress's use of the phrase "under this section" to qualify the term "waiver of fees" indicates its intent to apply the de novo provision broadly to fee determinations under FOIA, however. *See United States v. Hines*, 694 F.3d 112, 118 (D.C. Cir. (finding that Congress ordinarily adheres to a hierarchical scheme in subdividing statutory sections, which uses subsections, paragraphs, subparagraphs, and clauses) (citation and quotation marks omitted). By selectively reading the term "waiver of fees" into subsection (iii) but excluding it from subsection (ii), the PTO violates the statutory construction canon requiring these related provisions of "this section" to be read *in pari materia*. *See City of Tacoma, Washington v. FERC*, 331 F.3d 106, 115 (D.C. Cir. 2003) ("The Commission's failure to interpret consistently two statutory provisions that are *in pari materia* manifests that it has not correctly read 'the language and design of the statute as a whole.'") (citation omitted).

Similarly, numerous courts have found that de novo review is also proper for fee

category determinations. While not ultimately deciding the issue, the court in *Electronic Privacy Information Ctr. v. Dep't of Defense* ("*EPIC*") reasoned that "[t]he statutory language, judicial authority, and [the Freedom of Information Reform Act's] legislative history [] support the view that determinations regarding preferred fee status are reviewed de novo." 241 F. Supp. 2d 5, 9 (D.D.C. 2005) (collecting cases). Since *EPIC*, courts have found that so-called fee category determinations under § 552(a)(4)(A)(ii) are to be decided under a de novo standard of review. For example, *Center For Public Integrity v. HHS* applied a de novo standard and explained that "[m]ost, but not all, district courts have employed a de novo standard of review for FOIA fee category determinations." No. CIV. A. 06-1818 JDB, 2007 WL 2248071, at *3 & n.2 (D.D.C. Aug. 3, 2007) (acknowledging that HHS agreed the de novo standard was applicable). Similarly, *Long v. Dep't of Homeland Security* found that "[c]ourts review agency decisions on requester status and fee waiver requests through a '*de novo* review of the record' that was before the agency" and applied this standard in determining whether the requester was an educational or news representative under § 552(a)(4)(A)(ii). 113 F. Supp. 3d 100, 103 (D.D.C. 2015) (citation omitted). The court in *Liberman v. U.S. Dep't of Transportation* reached the same conclusion, applying a de novo standard to a dispute focused on whether the requester was a news-media requester under § 552(a)(4)(A)(ii)(II). *See* 227 F. Supp. 3d 1, 8–10 (D.D.C. 2016). Indeed, nearly every court of the district in the past ten years has applied the de novo standard of review.

The D.C. Circuit has also applied the same de novo standard of review. *See Cause of Action v. FTC*, 799 F.3d 1108 (D.C. Cir. 2015). There, the requester appealed both the denial of the "complete waiver of the customary fees" under the public interest exception, § 552(a)(4)(A)(iii), and the denial of its alternative waiver of all but duplication costs as a representative under the news media category of § 552(a)(4)(A)(ii)(II). *Id.* at 1110–11. The D.C. Circuit applied a de novo standard to its review under both provisions: "We review de novo both the district court's grant of summary judgment and the agency's denial of the fee waiver applications." *Id.* at 1113. No other standard of review, let alone the arbitrary and

15

capricious standard espoused by the PTO, is found in the opinion.[6] Since *Cause of Action*, other courts have relied upon it and applied the de novo standard to categorization decisions under § 552(a)(4)(A)(ii). *See Yanofsky v. U.S. Dep't of Commerce*, 306 F. Supp. 3d 292, 298 (D.D.C. 2018) (explaining de novo standard applies to FOIA's fee regime).

The PTO's resort to legislative history, assuming it is relevant in light of the Act's plain text, fares no better. *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1288 (D.C. Cir. 2007) (Kavanaugh, J.) (stating that legislative history cannot trump the plain language of the statute). While statements by Senator Hatch could be construed as supporting PTO's position, *but see EPIC*, 241 F. Supp. 2d at 9 (stating that Senator Hatch's statements support de novo review), Senator Leahy, the chief Senate sponsor of the statute, explained that "any person or organization which regularly publishes or disseminates information to the public"—e.g., criterion from § 552(a)(4)(A)(ii)(II)—should qualify for waivers as a 'representative of the news media.'" 132 Cong. Rec. 27190 (Sept. 30, 1986); *accord EPIC*, 241 F. Supp. 2d at 9 n.1. Accordingly, the legislative history is equally supportive, if not more supportive, of applying the de novo review standard to the PTO's commercial use determination.

The PTO's argument fares no better on the merits. "Commercial use" is a "use or purpose that furthers the commercial, trade, or profit interests of the requester or the person on whose behalf the request is made." *Liberman*, 227 F. Supp. 3d at 9. Whether a request is for commercial use "is determined not by the identity of the requester, but the use to which he or she will put the information obtained.... '[U]se' is the exclusive determining criterion.'" *Id.* at 17. In determining whether a FOIA applicant's request should be classified as commercial, the Court should evaluate the "use" for the records. *Id.* And the applicant's good faith in stating the intended use should not be doubted unless "the requester has a track record that gives the agency reason for doubt." *Id.* at 20.

---

[6] The district court in that case also applied a de novo standard to the fee category determination. *Cause of Action v. F.T.C.*, 961 F. Supp. 2d 142, 161 (D.D.C. 2013).

As Mr. Hyatt attested in detail, he intends to use the requested records to educate the public about the operations of the Hyatt Unit and to expose what he believes is systemic misconduct in the unit, matters that the Court has already found is in the public interest. *Hyatt*, 346 F. Supp. 3d at 152. That is exactly why FOIA exists—"to open agency action to the light of public scrutiny." *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 772 (1989) (quotation marks omitted); *see also id.* ("The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know *what their government is up to*."). Moreover, while Mr. Hyatt has not foreclosed the possibility that he also would use the requested documents in litigation if cause exists to do so, the PTO has failed entirely to explain how such material would further the commercial purpose of issuing patent applications, which can only be granted on their merits.

In this way, Mr. Hyatt's expected use of the records is akin to that of any for-profit media organization that requests agency records to publicize their contents and to sell that publication to its subscribers. That was the precise situation faced by this court in *Liberman*, 227 F. Supp. 3d at 14, where the court disclaimed the type of second-guessing of FOIA requesters' sworn statements that the PTO attempts with Mr. Hyatt's declaration. Just as in *Liberman*, Mr. Hyatt has a concrete platform and plans to disseminate the public information and a reasonably broad audience that can be expected to be interested in the information. And in both cases, there may be a subordinate commercial interest, but the primary use of the documents is to educate the public.

This situation is far different from the only adverse commercial use determination decision that the PTO cites in its brief, *Rozet v. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 55, 57 (D.D.C. 1999). In that case, the Court disregarded a conclusory affidavit that the requester would not put the material to a commercial use where the requester filed FOIA requests related to him and his corporations shortly after HUD filed a civil fraud action against him and his corporation. Unlike the requester in *Rozet* but like the requester in *Liberman*, Mr. Hyatt

17

has provided substantial evidentiary detail about *how he would use* the requested information to educate the public, and that information supports his averment that he is not a commercial user on the information. Likewise, there is no indication that the requester in *Rozet* explained the public interest in learning the information in question, but Mr. Hyatt's FOIA request would reveal whether the misconduct already uncovered in the PTO's practices are examples of isolated wrongdoing or just the tip of the iceberg. The public has a vast interest in learning the answer to that question

The PTO's other authorities are not on-point. *VoteHemp, Inc. v. DEA*, 237 F. Supp. 2d 55, 64 (D.D.C. 2002), was a fee waiver case but not a commercial use categorization case, as the plaintiff in that case specifically "has not challenged" the "categorization of its request" as a commercial use request. While the *VoteHemp* court found that due to the nature of the non-profit requester it had a commercial interest in the disclosure of information, it did not address the separate question of whether the use to which the documents would be put is commercial.

Similarly, *McClain v. U.S. Dep't of Justice*, 13 F.3d 220 (7th Cir. 1993), was a fee waiver case, not a commercial use categorization case, and the court there found that the prison inmate's FOIA request seeking to support a challenge to his conviction was not commercial. In this regard, *McClain* supports a finding that Mr. Hyatt's request is aimed at educating the public about what he believes to be PTO misconduct, and that this purpose is not commercial. And while the PTO interprets *McClain* as an example of a court disregarding a supported sworn statement in the FOIA wavier context, it is far from clear that the *McClain* court actually disregarded a sworn statement by the FOIA requester—the Court talks about disregarding unsupported "averments," but averments could mean complaint paragraphs, legal briefing, or even something else in the context of a pro se prisoner suit like *McClain*. *McClain* is far removed this case, where Mr. Hyatt offered a sworn statement of his planned use of the requested materials on the ACET and www.ptomisconduct.com websites, as well as his capability to put the requested material on those websites.

In summary, Mr. Hyatt has sworn under oath that his use for the FOIA records is to expose the PTO's actions to the public, and he has a track record of providing that information to the public as promised. *Liberman* is on-point in confirming that these statements alone suffice when there is no reason to doubt the good faith of a requester's use for the FOIA records. The PTO's unsworn speculations to the contrary without on-point authority are insufficient to demonstrate that Mr. Hyatt's use is commercial.

## CONCLUSION

For the reasons discussed above and in Mr. Hyatt's motion for summary judgment, the Court should grant Mr. Hyatt's motion for summary judgment, deny the PTO's cross-motion for summary judgment, determine that he is entitled to a fee waiver in conjunction with his modified request, and determine that he is not a commercial-use requester.

Dated: May 31, 2019

Respectfully submitted,

 /s/ Mark W. DeLaquil 
MARK W. DELAQUIL
   D.C. Bar No. 493545
ANDREW M. GROSSMAN
   D.C. Bar No. 985166
PAUL M. LEVINE
   D.C. Bar No. 999320
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036
(202) 861-1697
mdelaquil@bakerlaw.com
agrossman@bakerlaw.com
pmlevine@bakerlaw.com

*Attorneys for Plaintiff Gilbert P. Hyatt*

**Certificate of Service**

I hereby certify that, on May 31, 2019, I caused the foregoing to be filed using the Court's CM/ECF system. All counsel of record will be served through the Court's CM/ECF system.

Respectfully submitted,

 /s/ Mark W. DeLaquil
Mark W. DeLaquil

*Attorney for Plaintiff Gilbert P. Hyatt*